## COMMONWEALTH *vs.* SEVERO FIGUEROA.

Essex. February 8, 2008. - June 5, 2008.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & BOTSFORD, JJ.

*Homicide. Practice, Criminal,* Capital case, Jury and jurors, Empanelment of jury, Voir dire, Presumption of innocence, Confrontation of witnesses, Immunity from prosecution, Assistance of counsel, Instructions to jury. *Jury and Jurors. Evidence,* Testimony before grand jury, Consciousness of guilt. *Constitutional Law,* Confrontation of witnesses.

At a criminal trial, no substantial likelihood of a miscarriage of justice arose from the judge's failure, during the empanelment process, specifically to inquire of the venire their understanding of the presumption of innocence to which the defendant was entitled, where the defendant did not demonstrate that he was injured by the judge's omission; where the judge asked the potential jurors whether they could decide the case based solely on the evidence; and where the judge, both in his initial remarks to the jury and in his final instructions, included the Commonwealth's burden to prove the defendant guilty beyond a reasonable doubt. [568-573]

At a criminal trial, the judge's admission in evidence of a portion of a witness's grand jury testimony did not violate the defendant's right to confront witnesses against him, where the witness was available for cross-examination [573-576]; further, the testimony was properly admissible for substantive purposes, as the witness's lack of memory was a recent fabrication, the witness did not deny his testimony to the grand jury, and the witness was available for cross-examination [576-577].

There was no merit to the criminal defendant's argument that his trial counsel was ineffective for failing to move to revoke immunity that had been granted to a witness for the Commonwealth in exchange for his testimony, or that the judge erred in granting the immunity, where the defendant had no standing to argue that the witness's testimony was the product of an improper grant of immunity. [577-578]

At a criminal trial, the judge did not err in instructing the jury, over objection, on consciousness of guilt, where evidence existed that the defendant had fled the scene by getting into a witness's car and asking for a ride out of town; where evidence that the police contacted the defendant's sister, mother, and girl friend would allow the jury reasonably to infer that the defendant knew that the police were looking for him; and where the fact that the defendant was arrested in the Dominican Republic, in combination with testimony that the defendant was from an area in the Commonwealth, would permit an inference that the defendant had fled the country. [578-580]

INDICTMENT found and returned in the Superior Court Department on November 22, 2000.

The case was tried before *Robert H. Bohn*, J.

*Stephen Neyman* for the defendant.

*David F. O'Sullivan*, Assistant District Attorney, for the Commonwealth.

IRELAND, J. In 2003, an Essex County jury convicted the defendant of murder in the first degree. The defendant appealed. He argues that the trial judge erred by failing specifically to inquire of the venire their understanding of the presumption of innocence pursuant to G. L. c. 234, § 28, by allowing a portion of a witness's grand jury testimony to be read to the jury for substantive purposes, and by instructing the jury on consciousness of guilt. He also argues that his counsel was ineffective for failing to move for the revocation of a witness's order of immunity, and asks us to reverse his conviction pursuant to G. L. c. 278, § 33E. Because we conclude that there are no errors requiring reversal of his conviction and discern no reason to exercise our power under G. L. c. 278, § 33E, we affirm the defendant's conviction.

*Facts and procedure.* We recite the facts the jury could have found, reserving certain details for our discussion of the issues raised.

The evidence against the defendant was introduced through the testimony of Miguel Rodriguez and Javier Laboy. Both had been gang members, had extensive criminal records, and had cooperation agreements with the Commonwealth.

In the late evening of October 28, 2000, the victim was driving around Lawrence with Rodriguez. The pair decided to attend a Halloween party at a home on Washington Street. At about midnight, as the victim pulled his car up in front of the house, the defendant hit the back of the car and said to Rodriguez, "Step out of the car. Let's knuckle up." Rodriguez got out of the car. At first he thought the defendant wanted to fight, but then realized that the defendant was joking.

He and the defendant spoke. The defendant then asked Rodriguez what he was doing with the victim, stating, "Take [the victim] out of here before I blast him." Rodriguez got back in the car and told the victim to "take off." Rodriguez saw the defendant put his arm through the car's window and heard three shots. The mortally wounded victim drove away.

Rodriguez noticed that the victim was wounded and asked him to pull the car over so that he could drive the victim to a hospital. The victim said that he would be all right, but within a short distance, he said, "I'm dead," and fell over onto Rodriguez's lap. Rodriguez gained control of the car and stopped it. After trying and failing to get the victim out of the driver's side of the car and into its back seat, he flagged down a police cruiser.

The victim had been shot twice in the left arm. One of the bullets went through his arm into his chest. The victim died at a hospital of a gunshot wound to the abdominal aorta, which caused hemorrhaging. Two bullets were recovered from the victim, one from his left arm and one from the muscles in his abdominal wall. No gun was ever found.

In the meantime, Laboy had been at the Halloween party and had seen the defendant arguing with the victim and Rodriguez. He heard shots and ran out of the house and across the street to his automobile. As he was about to drive away, the defendant asked him for a ride. Once in the vehicle, Laboy asked the defendant what had happened. The defendant stated, "I just shot somebody, can you get me out of here." The defendant also asked Laboy to take him "out of town." Laboy refused and instead took the defendant to a home on Front Street.[1]

*Discussion.* 1. *Presumption of innocence inquiry.* The defendant argues that the judge erred when, during the jury empanelment process, he failed to question potential jurors specifically about the presumption of innocence to which a defendant is entitled. At trial, defense counsel did not object to this omission

---

[1]The defendant did not testify at trial. His defense was that he was being framed by a gang called the Latin Gangster Disciples, of which at least Rodriguez and Laboy's brother were erstwhile members, and that the two witnesses against him were lying to get help from the Commonwealth with various criminal charges. Through cross-examination the defendant showed that, over time, the pair had changed their stories about the events that night, that only two shots were fired, that fingerprint evidence did not tie the defendant to the crime, and that there was no evidence that the shots fired were at a very close range. He emphasized that there was no evidence against the defendant other than the testimony of the two witnesses. He also called one witness, an emergency medical technician, who testified that, while he was tending to the victim at the scene, he asked the victim if he knew who shot him and the victim said that he did not.

and thus we review it to determine whether there was a substantial likelihood of a miscarriage of justice.[2] See *Commonwealth* v. *Vinton*, 432 Mass. 180, 188 (2000); *Commonwealth* v. *Barrows*, 391 Mass. 781, 783-784 (1984).

A defendant is entitled to a fair trial. See *Commonwealth* v. *Graves*, 363 Mass. 863, 872-873 (1973). Subsumed in that right is a right to a trial by a fair and impartial jury. *Commonwealth* v. *Susi*, 394 Mass. 784, 786 (1985). See *Irwin* v. *Dowd*, 366 U.S. 717, 722 (1961) (right to fair and impartial jury essential to due process). The United States Constitution does not require that specific questions be asked of a venire for purposes of determining their impartiality. *Morgan* v. *Illinois*, 504 U.S. 719, 729-730 (1992). But see *Commonwealth* v. *Hunter*, 427 Mass. 651, 654 n.5 (1998); *Commonwealth* v. *Ramirez*, 407 Mass. 553, 554-556 (1990) (discussing questioning jurors about racial prejudice).

States are free to "allow or require questions not demanded by the Constitution." *Ristaino* v. *Ross*, 424 U.S. 589, 597 n.9 (1976). The Legislature set forth such questions in G. L. c. 234, § 28.

> "The first paragraph of G. L. c. 234, § 28, requires a judge, on request, to examine each prospective juror 'to learn whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice, therein . . . . In a criminal case such *examination shall include questions designed to learn whether such juror understands that a defendant is presumed innocent until proven guilty*, that the Commonwealth has the burden of proving guilt beyond a reasonable doubt, and that the defendant need not present evidence in his behalf' " (emphasis added).[3]

---

[2]The defendant's argument on appeal is made pursuant to G. L. c. 234, § 28. The defendant's motion for a juror voir dire stated that it was brought pursuant to Mass. R. Crim. P. 20, 378 Mass. 889 (1979), and cited G. L. c. 234, § 28 — the statute that would require a judge to inquire, inter alia, into the subject of the presumption of innocence (discussed *infra*) — only to support his argument that a judge must excuse any juror who is not indifferent. The question whether the defendant's request was brought pursuant to the statute (the Commonwealth argues that it was not) does not affect our standard of review.

[3]The last two sentences of G. L. c. 234, § 28, including the sentence pertinent

*Commonwealth* v. *Lopes*, 440 Mass. 731, 736 n.8 (2004). See *Commonwealth* v. *Gordon*, 422 Mass. 816, 822-823 (1996) (referring to G. L. c. 234, § 28, as "legislative objective" to make sure jury understand presumption of innocence, Commonwealth's burden of proof, and that defendant does not have to present evidence in his behalf).

If a motion is filed, it is mandatory that a judge inquire into the subjects set forth in § 28. *Commonwealth* v. *Sheline*, 391 Mass. 279, 290 (1984). See *Commonwealth* v. *Gordon, supra.* However, no irregularity in the empanelment of jurors is sufficient to overturn a verdict unless an objection is made before the verdict or unless the defendant demonstrates injury from the error. G. L. c. 234, § 32. See *Commonwealth* v. *Campbell*, 394 Mass. 77, 84 (1985) (defendant must show some injury due to irregularity during empanelment); *Commonwealth* v. *Fudge*, 20 Mass. App. Ct. 382, 388-389 (1985), and cases cited, quoting *Brooks* v. *Glidden*, 329 Mass. 704, 708 (1953) (failure to object under G. L. c. 234, § 28, "is a waiver and constitutes a mere irregularity" unless prejudice is shown). See also *Commonwealth* v. *Barrows, supra* (reviewing failure to object to jury empanelment under miscarriage of justice standard); *Commonwealth* v. *MacDonald*, 368 Mass. 395, 400 (1975) (failure timely to object to error in jury empanelment constitutes waiver).

Here, before the empanelment process began, the judge stated that the defendant denied the Commonwealth's allegations against him and that he had asked to have a trial so that a jury could determine whether the Commonwealth could prove the charges against him beyond a reasonable doubt. He told potential jurors that he was going to ask them questions because he had to be sure that the defendant had a jury capable of deciding the case only on the evidence. He introduced the parties and read the list of potential witnesses. He then asked the venire, inter alia, whether they knew anyone whose name he had read, whether they had any bias toward any participant in the case, whether they had a

here, were added by St. 1985, c. 463. Here, the venire were asked whether they understood the Commonwealth's burden of proof and the defendant's right not to present evidence. There is overlap between the statute and rule 20 (b) (1), which requires a judge to make inquiries of a venire but does not include a requirement that the judge inquire about subjects similar to the ones set forth in the third sentence of G. L. c. 234, § 28.

bias concerning the merits of the case, and whether they had formed an opinion about the case. He stated that the entire burden of proof was on the Commonwealth and that the defendant need not testify, introduce any evidence, or make any argument concerning the charges against him. He did not specifically state that the defendant is presumed innocent.

The judge then began an individual voir dire of the potential jurors who had responded to the initial questions. Some of them were excused. The judge told the remaining venire that he would conduct a second round of questions individually, reiterated that the goal was to find an impartial jury, and told them not to discuss the charge among themselves so as not to compromise the level of impartiality they had achieved up to that point. They also were told in advance the issues about which they would be questioned at the individual voir dire. One of the questions was whether the potential juror could decide the case based only on the evidence.[4]

The defendant identifies no specific injury in his challenge pursuant to G. L. c. 234, § 28, as required by G. L. c. 234, § 32. Instead he argues that this court has impliedly held that a judge has no discretion not to ask a question concerning the presumption of innocence. *Commonwealth* v. *Keohane*, 444 Mass. 563, 572 (2005). The defendant's reliance on the *Keohane* case is not apt, because a presumption of innocence inquiry was not at issue in that case. He cites no other authority in support of his argument, and while it is unclear whether the defendant is arguing that a judge must use the words "presumption of innocence" or just inquire into the topic, as discussed, where a defendant requests it, it is mandatory that a judge inquire into the "subjects" set forth in § 28. *Commonwealth* v. *Sheline*, 391 Mass. 279, 290 (1984).

Even assuming that the judge's omission of a question concerning the presumption of innocence was error, there was no substantial likelihood of a miscarriage of justice. The presumption of innocence is closely tied to the State's burden of proof beyond

---

[4] The other questions concerned whether jurors could be impartial in light of the defendant's Hispanic ethnicity, graphic testimony or photographs, evidence of gang affiliation, and witnesses who were granted immunity or had criminal backgrounds.

a reasonable doubt. As this court stated in *Commonwealth* v. *Boyd*, 367 Mass. 169, 188 (1975), quoting *Commonwealth* v. *DeFrancesco*, 248 Mass. 9, 13 (1924), "[t]he presumption of innocence serves as a focus on the prosecutor's burden of producing evidence of guilt and persuading the jury of the guilt beyond a reasonable doubt. . . . Its function is to emphasize to the jury that 'the finding of an indictment by the grand jury . . . [is] not to be regarded as . . . [a circumstance] tending to criminate the defendant or creating against him unfavorable impressions, and that he is not to be found guilty upon suspicion or conjecture but only upon evidence produced in court.' " Here, the judge stated both the Commonwealth's burden and the fact that the defendant did not have an obligation to present evidence or even argue against the charges. The judge asked other questions designed to make sure that the jury were impartial, including his question during the individual voir dire concerning whether the potential jurors could decide the case solely on the evidence.[5] See *Commonwealth* v. *Blanchette*, 409 Mass. 99, 105 (1991), quoting *Commonwealth* v. *Drayton*, 386 Mass. 39, 46 (1982) (even in final jury charge, "judges need not give any particular content to the phrase 'presumption of innocence,' if the instructions make clear that the indictment does not imply guilt").

Moreover, in his final instructions to the jury, the judge, inter alia, reiterated the Commonwealth's burden to prove the defendant's guilt beyond a reasonable doubt, explained that it meant that the defendant received every presumption of being not guilty, and stated that the defendant was presumed innocent throughout the trial.[6]

In these circumstances, where the defendant has not demon-

---

[5] In attempting to support a claim that he suffered an injury, the defendant argues, quoting *Commonwealth* v. *Pinckney*, 419 Mass. 341, 342 (1995), that his injury "resembles situations where reversal is mandated in light of a reasonable doubt instruction [because] '[a] constitutionally deficient reasonable doubt instruction amounts to a structural error which defies analysis by harmless error standards.' " We decline to call the omission of a query concerning the presumption of innocence a "structural error" where, as here, there was no error in the reasonable doubt instruction.

[6] The judge stated, "Now the first principle . . . has to do with a concept that we have discussed before, and that is the fact that this defendant is presumed at the outset of his trial, to be not guilty. You will recall I said to you

strated that he was injured by the judge's omission, G. L. c. 234, § 32; where the judge's initial remarks to the jury included the Commonwealth's burden to prove the defendant guilty beyond a reasonable doubt; and where the judge asked whether the potential jurors could decide the case based solely on the evidence, there was no substantial likelihood that the jury did not understand the presumption of innocence. *Commonwealth* v. *Boyd, supra.* See *Commonwealth* v. *Sleeper,* 435 Mass. 581, 600 (2002), citing *Kentucky* v. *Whorton,* 441 U.S. 786, 789-790 (1979) (even in final charge to jury, failure to give presumption of innocence charge not unconstitutional); *Commonwealth* v. *Vann Long,* 419 Mass. 798, 803 (1995), quoting *Commonwealth* v. *Ascolillo,* 405 Mass. 456, 459 (1989) (large degree of discretion afforded to judge's determination of juror impartiality).

2. *Admission of Laboy's grand jury testimony.* In his grand jury testimony, Laboy stated that the defendant said that he had shot someone. Approximately ten months later, Laboy signed a statement whereby he recanted his entire testimony, stating that he was impaired by marijuana and cocaine the evening of the murder and that he gave someone else a ride from the party.

Before trial, the judge held a hearing on the Commonwealth's request that Laboy be immunized from prosecution if he testified at trial to the events concerning his giving the defendant a ride after the murder. See G. L. c. 233, § 20E (*a*). At the hearing, Laboy stated that he could not recall whether the defendant said that he shot someone. He also stated that he was invoking his right to remain silent pursuant to the Fifth Amendment to the United States Constitution. The judge granted Laboy immunity.

On voir dire, Laboy was questioned about the events of the evening of the murder. He was able to recall many specific details but claimed he was unable to recall his testimony to the grand

when we first met, that in cases such as this, a defendant is presumed at the outset of his trial to be not guilty. That presumption of innocence . . . is a rule of law that compels you to find this defendant not guilty unless you find as reasonable individuals that the Commonwealth has proven each of the elements of any one of those crimes which I described to you. A presumption of innocence attaches to the defendant at the beginning of the trial, and remains with that defendant throughout all of the stages of the trial and it remains with that defendant until, and only until, and unless a jury has found that the Commonwealth has proven the elements of a particular crime beyond a reasonable doubt."

jury that the defendant asked Laboy to take him out of town and admitted that he just shot someone. Although Laboy did not deny his testimony to the grand jury, when he was shown a transcript of his testimony it failed to refresh his memory.

The Commonwealth moved to have the relevant part of the grand jury testimony admitted substantively. The defendant objected, stating that it would violate his right to confrontation under the Sixth Amendment to the United States Constitution. The judge found, inter alia, that Laboy's lack of memory was a recent fabrication. When Laboy testified at trial and claimed a lack of memory about the defendant's statements the evening of the murder, the pages of Laboy's grand jury testimony concerning the defendant's statements that he shot someone and wanted Laboy to take him out of town were read to the jury as a prior inconsistent statement.[7] After the relevant portion of the testimony was read to the jury, Laboy was asked what he recalled

---

[7]The following, in pertinent part, is the grand jury testimony that was read to the jury:

*Q.*: "When the [car] door opened, what happened? . . ."

*A.*: "[H]e got in my car, he asked me for a ride."

*Q.*: "Did you look at the person?"

*A.*: "Yes."

*Q.*: "Who was it?" '

*A.*: "Some guy . . . I know from the street, named Pito Caco [an alias of the defendant]."

*Q.*: "How long was it after you got in your car before [the defendant] got in?"

*A.*: "Two seconds, three seconds."

*Q.*: "Did you make any observations of him once he got in?"

*A.*: "No."

*Q.*: "Did he leave the door open or did he close it?"

*A.*: "He closed it."

*Q.*: "How long after he got in before he closed it?"

*A.*: "He closed it as soon as he got in the car."

*Q.*: "What did he say to you?"

*A.*: "He says, 'Give me a ride.' "

*Q.*: "When he says 'Give me a ride,' what did you say?"

*A.*: "I said, 'Where are you going?' "

*Q.*: "What did [the defendant] say?"

*A.*: "He says, 'Take me home' and then at that point I told him, 'What happened,' I says. . . . . I says, 'I heard the gunshots.' "

of that testimony. He stated that he recalled only some parts of it, but it did not include the defendant's incriminating statements.

The judge placed no limit on the cross-examination of Laboy, who did not refuse to answer any of the questions defense counsel asked. Concerning the incriminating statements, counsel elicited that Laboy had offered three different versions of the night of the murder and asserted the defense theory about why the story changed. Defense counsel implied, in essence, that Laboy's version of events that were part of his grand jury testimony[8] (with the defendant's incriminating statements) was created

*Q.:* "So you, just so we can go slowly here, you asked him 'what happened? I just heard gunshots'?"

*A.:* "Yes."

*Q.:* "When you asked him 'what happened, I just heard gunshots.' Did [the defendant] answer you?"

*A.:* "Yes."

*Q.:* "What did he say to you?"

*A.:* "He said, . . . 'I just shot somebody, can you get me out of here?' "

*Q.:* "When he said, 'I shot somebody, can you get me out of here,' how long was it between when you heard those shots before [the defendant] told you, 'I shot somebody, can you get me out of here?' How much time between those two things?"

*A.:* "I was already on the road whenever he told me that."

*Q.:* "How long was . . . that after you left the party?"

*A.:* "That was like, it couldn't have been far, right in the same street. . . ."

*Q.:* "The party was on?"

*A.:* "Yes."

*Q.:* "And you went to your car immediately when you heard the gunshots, correct?"

*A.:* "Yes."

*Q.:* "And how long were you in your car before [the defendant] got in your car?"

*A.:* "Like two seconds."

*Q.:* "Now, where did you take him?"

*A.:* "I took him over to George's house. . . . He told me to give him a ride out of town."

*Q.:* "When he told you to give him a ride out of town, what did you say to him?"

*A.:* "I said, 'No. I'll give you a ride wherever you want to go right now.' . . . He told me he wanted to go over to George Cordero's house."

[8]Laboy also gave a statement to police on October 30, 2000, that included the defendant's incriminating statements.

after he spoke to Rodriguez or the victim's family[9]; that the recantation in 2001 was to obtain leverage for Federal drug charges; and that the trial version (without the incriminating statements) was in consideration of a reduction in a Federal sentence Laboy was serving.

The defendant argues that the judge erred in allowing the grand jury testimony to be read to the jury. He argues that the testimony falls within "the 'core class' of statements that are always testimonial" and, as there was no possibility to "cross-examine the integrity of the statement," it was inadmissible pursuant to *Crawford* v. *Washington*, 541 U.S. 36 (2004) (*Crawford*), and later *Davis* v. *Washington*, 547 U.S. 813, 821-822 (2006), and *Commonwealth* v. *Galicia*, 447 Mass. 737, 746 (2006). There was no error.

In *Crawford*, the United States Supreme Court stated that admitting testimonial out-of-court statements as evidence violates the confrontation clause of the Sixth Amendment to the United States Constitution unless the declarant is available at trial or the declarant is unavailable to testify but the defendant had an opportunity to cross-examine the declarant. *Crawford, supra* at 59 n.9 & 68. See *Commonwealth* v. *Fordham*, 417 Mass. 10, 18 (1994), quoting *Davis* v. *Alaska*, 415 U.S. 308, 315-316 (1974) (primary interest secured by right to confrontation is right of cross-examination). Laboy's grand jury testimony is indisputably testimonial within the meaning of *Crawford, supra* at 68. However, *Crawford* also states that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements . . . so long as the declarant is present at trial to defend or explain it." *Id.* at 59 n.9, and cases cited. Here, Laboy was available for cross-examination.

The admission of Laboy's testimony also was consistent with the requirements of *Commonwealth* v. *Daye*, 393 Mass. 55, 73-74 (1984), as modified by *Commonwealth* v. *Cong Duc Le,*

---

[9] A transcript of a telephone call from the victim's brother to Rodriguez was admitted for the limited purpose of assessing Rodriguez's credibility. The import of that call for the defense's theory about Laboy's motive for the first version of events is that the call occurred before Laboy went to give his statement to police.

444 Mass. 431 (2005), and *Commonwealth* v. *Sineiro*, 432 Mass. 735, 742-743 (2000). See *Commonwealth* v. *Clements*, 436 Mass. 190, 193 (2002) (clarifying factors necessary for admissibility of prior testimony). At the voir dire, the judge found that there was an opportunity for effective cross-examination of Laboy. See *Commonwealth* v. *Daye, supra* at 73. He also found that Laboy's grand jury testimony was not coerced. *Id.* at 74 & n.20 (answers must not be mere confirmation or denial of interrogator's questions). The judge found that Laboy's lack of memory was a recent fabrication. See *Commonwealth* v. *Sineiro, supra* at 741-743 & n.7 (Commonwealth allowed to introduce victim's testimony from probable cause hearing where judge found claims of lack of memory to be fabrication).[10]

In addition, as discussed, Laboy did not deny his testimony to the grand jury. See *id.* at 742. He recalled events to which the statement related, including the events of the evening until the defendant asked him for a ride and so much of the grand jury testimony as it related to where he took the defendant that evening. *Commonwealth* v. *Daye, supra* at 73 (recollection of events essential to effective cross-examination). Laboy also did not refuse to answer questions defense counsel posed to him, *Commonwealth* v. *Amirault*, 404 Mass. 221, 234 (1989) (lapse of memory not comparable to refusal to answer questions), nor was there any limitation placed on the cross-examination. Cf. *Commonwealth* v. *Johnson*, 365 Mass. 534, 543-544 (1974) (defendant's confrontation right violated where cross-examination limited). Defense counsel was able to probe fully Laboy's inconsistent versions of events. *Commonwealth* v. *Daye, supra* at 71-72 & n.15, quoting *California* v. *Green*, 399 U.S. 149, 159 (1970) ("The most successful cross-examination at the time the prior statement was made could hardly hope to accomplish more than [had] already been accomplished by the fact that the witness is now telling a different, inconsistent story . . .").

3. *Grant of immunity*. Although Laboy testified under a grant

[10]Laboy's grand jury testimony was not the only evidence against the defendant. *Commonwealth* v. *Daye*, 393 Mass. 55, 74 (1984) ("we will not permit convictions based exclusively on inconsistent extrajudicial testimony to stand"). See *Commonwealth* v. *Clements*, 436 Mass. 190, 193 n.3 (2002), and cases cited (additional evidence against defendant need not be sufficient to satisfy each element of crime).

of immunity, he was not given immunity for any false testimony he gave at trial. See G. L. c. 233, § 20E. The defendant argues that his trial counsel was ineffective because he failed to move to revoke the immunity granted to Laboy in exchange for his trial testimony or, alternatively, that the judge erred in granting the immunity because he knew that part of Laboy's testimony, claiming a lack of memory, was a lie.

These arguments have no merit because "[w]e have held, without qualification, that a defendant 'has no standing to argue that the testimony of . . . purportedly immunized witnesses [is] the product of improper grants of immunity.' " *Smith* v. *Commonwealth*, 386 Mass. 345, 349 (1982), quoting *Commonwealth* v. *Simpson*, 370 Mass. 119, 121 (1976). See *Commonwealth* v. *Mattos*, 404 Mass. 672, 680-681 (1989) (counsel not ineffective where defendant had no standing to challenge search and seizure).

"[T]he statutory procedure for a grant of immunity is designed to accommodate the witness's rights and the State's need for evidence. The statute is simply not addressed to the interests of defendants." *Smith* v. *Commonwealth, supra.* Subject to the approval of the court, it is the purview of the prosecutor to seek a grant of immunity, see *Commonwealth* v. *Curtis*, 388 Mass. 637, 644-645 (1983), or to seek an order of contempt if an immunized witness refuses to testify. G. L. c. 233, §§ 20E, 20H.

The defendant's reliance on *Commonwealth* v. *Steinberg*, 404 Mass. 602, 603-604 (1989), is unavailing where the case involved an immunized witness's challenge to his own immunity and contempt conviction for refusing to testify before a grand jury. Nor is there merit to the defendant's one-sentence claim, unsupported by authority, that his due process rights required the revocation of Laboy's immunity. *Commonwealth* v. *O'Brian*, 445 Mass. 720, 733, cert. denied, 127 S. Ct. 213 (2006). Defense counsel had ample opportunity, through cross-examination of Laboy, to elicit that he had offered more than one version of the events of that evening, and to attack the grant of immunity. In addition, in his trial testimony, Laboy did recall most of the events that evening until the defendant asked him for a ride and so much of the grand jury testimony as related to where he took the defendant that evening. There was no error.

4. *Consciousness of guilt instruction.* Within one or two days

of the murder, the State police began to search for the defendant. At trial, Sergeant Dennis Marks testified that he searched for the defendant's sister at two addresses in Lawrence because he had been told that the defendant lived with her. He also searched in Lowell, but eventually found the defendant's mother in Chelsea. Marks testified that the defendant's sister and mother were "uncooperative." He also visited the home of the defendant's girl friend in Lawrence. The defendant was arrested in June, 2001, in the Dominican Republic. At trial, the only evidence presented concerning his arrest outside the country was a stipulation stating the date and place. Only the fact that the defendant was arrested in the Dominican Republic was referenced in the judge's instructions to the jury. The judge told the jury that they could use the evidence if they found that the Commonwealth proved that the defendant did flee.

The defendant argues that it was error for the judge to instruct the jury, over objection, on consciousness of guilt. Relying on *Commonwealth* v. *Toney*, 385 Mass. 575 (1982), the defendant argues that the Commonwealth failed to demonstrate that police visits to relatives supported an inference "that the defendant did in fact know that the police were looking for him." This argument has no merit.

"It is well settled that evidence of flight may be introduced to show consciousness of guilt." *Commonwealth* v. *Carita*, 356 Mass. 132, 140 (1969). The *Toney* court explicitly held that the Commonwealth did not have to prove that the defendant knew, in fact, that the police were looking for her: "Evidence that a person flees from the scene of a crime *or* from his usual environs may be probative . . . ." (emphasis added). *Commonwealth* v. *Toney, supra* at 583, citing 2 J. Wigmore, Evidence § 276, at 129 (Chadbourn rev. ed. 1979).

At trial, the focus of the discussion concerning whether a consciousness of guilt instruction was appropriate was on the defendant's arrest in the Dominican Republic. However, there was other evidence supporting consciousness of guilt. Laboy testified that the defendant fled the scene not only by getting into Laboy's car and asking for a ride, but also by asking Laboy to take him out of town. Under the holding in the *Toney* case, this alone was enough to permit a consciousness of guilt instruction. *Com-*

monwealth v. *Epsom*, 399 Mass. 254, 258-259 (1987), citing *Commonwealth* v. *Toney*, *supra*. Evidence that the police contacted the defendant's sister, mother, and girl friend would allow the jury reasonably to infer that the defendant knew that police were looking for him. We do not agree with the defendant's argument that the fact that the police did not find the sister and mother in the first places they searched has bearing on whether the instruction was proper.[11] Moreover, the fact that he was arrested in the Dominican Republic, when Rodriguez testified that he knew the defendant from the Lawrence area, would allow a reasonable inference that he had fled the country. See *Commonwealth* v. *Otsuki*, 411 Mass. 218, 237 (1991). The defendant does not argue, nor could he, that the jury were not properly instructed. See *Commonwealth* v. *Stewart*, 398 Mass. 535, 547-548 (1986), quoting *Commonwealth* v. *Toney*, *supra* at 585 (judge must instruct jury that they may, but need not, consider consciousness of guilt as evidence of guilt and that they may not convict defendant solely on such evidence). There was no error.

5. *General Laws c. 278, § 33E*. We have reviewed the entire record as well as the defendant's claims of error pursuant to G. L. c. 278, § 33E, and we discern no reason to reduce the verdict or grant the defendant a new trial.

*Judgment affirmed.*

---

[11]In support of this argument the defendant relies on the court's statement in *Commonwealth* v. *Toney*, 385 Mass. 575, 583-584 (1982), that evidence of repeated visits by police to Toney's home and inquiries of her relatives allowed the jury to infer that Toney knew, in fact, that police were after her, and that all the Commonwealth had to show was that the defendant was not at her home or work for two weeks after the murder for the instruction to be proper. The defendant misreads the court's discussion as a rule of law. The court prefaced its discussion of these particular facts by stating that it was considering them even though the Commonwealth did not need to demonstrate that Toney in fact knew that police were after her. Cf. *Commonwealth* v. *Stuckich*, 450 Mass. 449, 452-453 (2008) (no evidence of consciousness of guilt where, in telephone conversation with defendant, detective did not order defendant to return to Commonwealth, report to police, or restrict his travel, and where defendant's evidence that he left for Illinois because he received job offer was not contradicted).